IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DAWN A. MCCRAY, et al.          :          CIVIL ACTION
                                :
        v.                      :
                                :
FIDELITY NATIONAL TITLE         :
INSURANCE COMPANY, et al.       :          NO. 08-775

MEMORANDUM

Dalzell, J.[1]                                  July 15, 2009

        In this putative class action, plaintiffs allege that
the twenty defendants conspired with one another to fix the price
of title insurance in Delaware.  Those defendants include (1) the
defendant rating bureau, Delaware Title Insurance Rating Bureau,
(2) the corporate parent defendants, Fidelity National Financial,
Inc., First American Corporation, Stewart Information Services
Corporation, Old Republic International Corporation, and the
LandAmerica Financial Group, and (3) the remaining fourteen
defendants -- the title insurer defendants -- most of whom being
subsidiaries of the corporate parent defendants.

        The defendants filed a joint motion to dismiss pursuant
Fed. R. Civ. P. 12(b)(6).[2]  We shall grant this motion for the
reasons explained below.

I.    **Factual Background**

        In Delaware, the Department of Insurance ("DOI")

---

[1]Sitting by designation pursuant to 28 U.S.C. § 292(b).

[2]The joint motion does not include LandAmerica Financial
Group, Inc., which has filed a voluntary petition for relief
under Chapter 11 of the Bankruptcy Code.

regulates title insurance[3].  18 Del. C. § 2502 (West 2009).

Title insurers are required to file their rates with the DOI.

Id. § 2504(a).  Delaware is a "file and use" state, i.e., the

insurers file their rates with the DOI and begin to charge them

after the effective date stated in their filings, unless the

Commissioner disapproves the rates.  Compl. ¶ 4; 18 Del. C. §

2506(a) ("[Rate] filings shall be deemed to meet the requirements

of this chapter unless disapproved by the Commissioner"); Elliott

v. Blue Cross & Blue Shield of Delaware, Inc., 463 A.2d 273, 274

(Del. 1983).

Delaware law permits insurers to comply with the rate

filing requirements through membership in a licensed rating

bureau.  18 Del. C. §§ 2510-12.  The title insurer defendants

here are all members of defendant Delaware Title Insurance Rating

Bureau ("DTIRB").  Compl. ¶¶ 3, 31.  DTIRB is a licensed rating

bureau that "obtains, compiles, and analyzes statistical data

from its members relating to their title insurance premiums,

losses and expenses."  Id. ¶ 19.  The Delaware legislature placed

title insurance under the authority of the DOI in 2002.  73 Del.

Laws, c. 402 (2002).  Since then, DTIRB has made only one rate

filing, which had an effective date of February 1, 2004.  Compl.

¶ 55, Ex. A.

---

[3]Title insurance is coverage that mortgage lenders oblige
real property purchasers to buy before issuing a mortgage.
Compl. ¶ 35.  The insurance only covers defects in the title
unknown at the time the policy is issued, and the price of the
policy is usually based on the property's cost.  Id. ¶¶ 36, 42.

The DOI obliges all rating bureaus to file "advisory prospective loss costs and supporting actuarial and statistical data" rather than simply filing advisory, final rates.  Delaware Department of Insurance, Forms and Rates Bulletin No. 5, Lost Cost Filing Requirements (Nov. 27, 1995) ("Bulletin No. 5")[4]. The DOI mandated that "[e]ach insurer must individually determine and file the rates it will use as a result of its own independent company decision-making process.  Advisory/rating organizations will continue to develop and file rules, relativity, and supplementary rating information on behalf of their participating insurers."  Id.  This regulation requires that each member of a rating bureau file its own rates, but allows the members' rate filings, as a predicate to their individual rates, to reference rating information that the rating bureau has filed with the DOI.

On November 13, 2003, before the first DTIRB filing went into effect, the DOI Commissioner, at DTIRB's request, exempted DTIRB members from filing rates in accordance with Bulletin No. 5, specifically the requirement to file loss cost data, because "there [was] no credible historic data, particularly with regard to expenses, that the rating bureau could use in preparing the initial rates."[5]  Delaware Department

---

[4]We take judicial notice of Bulletin No. 5, and the other Bulletin referred to herein, because the plaintiffs' complaint references them and they are public records of a state administrative agency.  Anspach ex rel. Anspach v. City of Philadelphia, 503 F.3d 256, 273 n.11 (3d Cir. 2007).

[5]DTIRB's request was made pursuant to 18 Del. C. § 2505, which provides that "the Commissioner may, by written order,

of Insurance, Forms and Rates Bulletin No. 27, Title Insurance
Filing Requirements (Nov. 13, 2003) ("Bulletin No. 27").
Although the Commissioner exempted DTIRB members from certain
Bulletin No. 5 filing requirements, she ordered that by February
1, 2004, DTIRB "must have an approved statistical plan in place,
[which would] allow for collection and aggregation of sufficient
premium, loss and expense data to enable the [DOI] to monitor
rate adequacy."  Id.

        The plaintiffs allege that the title insurer defendants
used DTIRB as a mechanism to set uniform rates, and, at the
behest of the title insurer defendants, DTIRB improperly included
in its rate calculation the cost of "kickbacks in the form of
finder's fees, gifts, and other financial enticements."  Compl.
¶¶ 31, 43.  The plaintiffs aver that the title insurance industry
is highly concentrated and noncompetitive (defendants account for
98% of the premiums paid in Delaware), and despite growing
efficiencies and profit margins, the rates have not changed since
2004.  Id. ¶¶ 54-57.  In contrast with property and casualty
insurance, these defendants do not market insurance to ultimate
purchasers, and plaintiffs claim that this is further evidence of
an agreement not to compete.  Id. ¶ 58.

---

suspend or modify the requirement of filing as to any kind of
insurance, subdivision or combination thereof, or as to classes
of risks, the rates for which cannot practicably be filed before
they are used."

## II.  <u>Analysis</u>[6]

As noted, plaintiffs allege that, through DTIRB, the defendants entered into an agreement to fix title insurance prices in Delaware, which is <u>per</u> <u>se</u> illegal price-fixing. Plaintiffs assert an antitrust claim under the Sherman Act, 15 U.S.C. § 1, and a state law unjust enrichment claim.  Compl. ¶¶ 70-78.  The defendants contend that we should dismiss the plaintiffs' complaint because the filed rate doctrine, also known as the filed tariff doctrine, bars these claims.  Defendants also argue that the plaintiffs have failed to allege sufficient facts to establish that the corporate parents of the Delaware title insurer defendants entered into a conspiracy with their subsidiaries to fix title insurance prices.

We first consider the issues related to the filed rate doctrine before turning to the sufficiency of the allegations against the corporate parent defendants.

---

[6]In reviewing a motion to dismiss for failure to state a claim, "[w]e accept all well pleaded factual allegations as true and draw all reasonable inferences from such allegations in favor of the complainant." <u>Worldcom, Inc. v. Graphnet, Inc.</u>, 343 F.3d 651, 653 (3d Cir. 2003).

To survive a motion to dismiss, the plaintiff must "allege facts sufficient to raise a right to relief above the speculative level." <u>Broadcom Corp. v. Qualcomm Inc.</u>, 501 F.3d 297, 317 (3d Cir. Sept. 4, 2007) (citing <u>Bell Atl. Corp. v. Twombly</u>, 127 S. Ct. 1955, 1965 (2007)).  The complaint must include "enough facts to state a claim to relief that is plausible on its face." <u>Twombly</u>, 127 S. Ct. at 1974. This requires "either direct or inferential allegations respecting all the material elements necessary to sustain recovery under <u>some</u> viable legal theory." <u>Haspel v. State Farm Mut. Auto. Ins. Co.</u>, 2007 WL 2030272 at *1 (3d Cir. Jul. 16, 2007) (unpublished) (quoting <u>Twombly</u>, 127 S. Ct. at 1969).

A.   **The Filed Rate Doctrine**

The filed rate doctrine goes back at least as far as
<u>Texas & Pacific Ry. v. Abilene Cotton Oil Co.</u>, 204 U.S. 426
(1907), but it was Justice Brandeis in <u>Keogh v. Chicago & Nw. Ry.
Co.</u>, 260 U.S. 156 (1922), who gave the doctrine explicit
foundation in his opinion for the Court.  In <u>Keogh</u>, the doctrine
precluded recovery of treble damages under the Sherman Act based
on the unreasonableness or excessiveness of the rate that
defendants submitted to the Interstate Commerce Commission
("ICC"), which had determined the rate submitted to be reasonable
and lawful.  <u>Id.</u> at 164.  Since <u>Keogh</u>, the Supreme Court has
expanded the doctrine beyond the ICC context and applied it to
bar state law claims as well.  <u>E.g., Ark. La. Gas Co. v. Hall</u>,
453 U.S. 571, 580 (1981) (dismissing state contract claim
involving rates filed with FERC).

Over the years, the doctrine's acceptance had
diminished to the point where Judge Henry J. Friendly suggested
that the Supreme Court overrule <u>Keogh</u> because modern legal
practice had obviated the need for such a doctrine.  <u>Square D
Company v. Niagra Frontier Tariff Bureau, Inc.</u>, 760 F.2d 1347,
1352-56 (2d Cir. 1985).  But the Supreme Court did not take Judge
Friendly's suggestion, and instead reaffirmed -- if tepidly --
the vitality of the filed rate doctrine.  <u>Square D Company v.</u>

Niagra Frontier Tariff Bureau, Inc., 476 U.S. 409, 424 (1986).[7]
Since this reaffirmation, courts have continued to apply the
filed rate doctrine and have developed a host of exceptions and
specific considerations that courts ought to address when
applying it.  See, e.g., Ultimax.com, Inc. v. PPL Energy Plus,
LLC, 378 F.3d 303, 306-07 (3d Cir. 2004) (discussing two
exceptions to the filed rate doctrine, neither of which being
relevant here).

        The pertinent considerations about the filed rate
doctrine lead us to conclude that it applies to the plaintiffs'
federal and state claims for money damages.  But the filed rate
doctrine does not necessarily foreclose all avenues of injunctive
relief the plaintiffs may be seeking.  Therefore, for the reasons
stated below, we will grant the defendants' motion to dismiss,
but afford plaintiffs leave to amend their complaint to request
injunctive relief that is consistent with the filed rate doctrine
and to allege facts sufficient to state a conspiracy claim
against the corporate parent defendants.


        **1.   Applicability of the Filed Rate Doctrine to
              Delaware's Title Insurance Regulation Regime**

        As a preliminary matter, our Court of Appeals has

----

[7]Square D involved an alleged horizontal price-fixing
conspiracy perpetrated by the defendants through a nonprofit
tariff bureau to which all of the defendants belonged, and
through which the defendants made rate filings with the ICC.  476
U.S. 409, 411-12.  The Supreme Court held that the filed rate
doctrine still precluded recovery of treble damages under the
Sherman Act.

applied the filed rate doctrine to bar claims when the rates involved have been filed with a federal agency, but has yet to specifically rule on whether the doctrine applies to rates that state administrative agencies authorize.  Cf. Ultimax.com, Inc. v. PPL Energy Plus, LLC, 378 F.3d 303, 306 (3d Cir. 2004).  Other courts have applied the doctrine to preclude recovery of money damages based on allegations that the rates filed with either state or federal agencies were inflated or improper.  See, e.g., Wegoland, Ltd. v. Nynex Corp., 806 F. Supp. 2d 1112, 1115-16 (S.D.N.Y.), aff'd 27 F.3d 17 (2d Cir. 1994) (dismissing civil RICO claim involving rate information filed with different state and federal agencies); Taffet v. Southern Co., 967 F.2d 1483, 1494 (11th Cir. 1992) (en banc) (dismissing civil RICO action involving rates filed with state utility regulators); H.J., Inc. v. Nw. Bell Telephone Co., 954 F.2d 485, 494 (8th Cir. 1992) (dismissing claims by telephone users involving rates filed with state public utility commission).

We have found no instance of a court holding that the filed rate doctrine does not apply because a state agency, rather than a federal one, authorized the rates.  Given the weight of authority in favor of applying the doctrine to state agency authorized rates, we will preclude the recovery of treble damages for a Sherman Act claim predicated on the alleged excessiveness or otherwise unreasonableness of a rate filed with a state administrative agency.

## 2. Keogh as Antitrust Immunity

Plaintiffs contend that Keogh and its progeny should only apply when "there is a clear repugnancy between the antitrust laws and the regulatory system."  Pl.'s Resp. at 11 (citing United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 348 (1963); Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213 (1966)).  This "repugnancy" argument relies on a characterization of the filed rate doctrine as an immunity from antitrust liability, which we should not apply without evidence of legislative intent to create such an immunity.  Pl.'s Resp. at 12 (citing Kirkwood v. Union Electric Co., 671 F.2d 1173, 1178 (8th Cir. 1982)).

But the Supreme Court addressed this very issue in Square D.  It held that "collective ratemaking activities are not immunized from antitrust scrutiny simply because they occur in a regulated industry" and thus Keogh does not engraft an immunity from antitrust liability.  Square D, 476 U.S. at 421-22. Instead, Keogh holds that "an award of treble damages is not an available remedy," but regulated companies remain "subject to scrutiny under the antitrust laws by the Government and to possible criminal sanctions or equitable relief."  Id.

Were we to permit money damages based on the unreasonableness of the filed rate, and the plaintiffs were successful in their claims, we -- or a jury -- would be obliged to determine what the rate should have been, i.e., to fix a "reasonable" rate different from the one the DOI thought

-9-

"reasonable".  As the Supreme Court has recognized,

> the problem is whether it is open to the
> courts to determine what the reasonable rates
> during the past should have been. The
> petitioner, in contending that they are so
> empowered, and the District Court, in
> undertaking to exercise that power, both
> regard reasonableness as a justiciable legal
> right rather than a criterion for
> administrative application in determining a
> lawful rate. Statutory reasonableness is an
> abstract quality represented by an area
> rather than a pinpoint. It allows a
> substantial spread between what is
> unreasonable because too low and what is
> unreasonable because too high. To reduce the
> abstract concept of reasonableness to
> concrete expression in dollars and cents is
> the function of the [regulatory body].

Montana-Dakota Utilities Co. v. Nw. Public Service Co., 341 U.S.

246, 251 (1951).

        The district court in Wegoland usefully identified "two

companion principles [that] lie at the core of the filed rate

doctrine: first, that legislative bodies design agencies for the

specific purpose of setting uniform rates, and second, that

courts are not institutionally well suited to engage in

retroactive rate-setting."  806 F. Supp. at 1115.  The first

principle is the "anti-discrimination strand and [the second is]

the non-justiciability strand."  Id.  The Supreme Court's holding

in Square D epitomizes the second of these strands because it

sought to avoid enmeshing courts in the rate setting process that

legislatures specifically entrusted to expert administrative

bodies.  But, as noted, the Supreme Court did not eliminate

antitrust liability but only excluded monetary relief that

-10-

involved consideration of an alternative, reasonable rate from the available antitrust remedies.

Thus, the filed rate doctrine does not amount to antitrust immunity, and we shall apply the doctrine to the plaintiffs' claims unless some other consideration counsels otherwise.

### 3.   **Adequacy of the Regulatory Regime**

The plaintiffs argue that we should not apply the filed rate doctrine because Delaware's regulatory regime is inadequate. They proffer two arguments: first, Delaware's regulatory regime does not provide for meaningful review of rates because it does not require express approval of rates; and, second, the Delaware regulatory regime is not comprehensive because it does not provide "full relief," i.e., retrospective money damages.  Pl.'s Resp. at 14-19.

### I.   **Meaningful Review**

Some courts have declined to apply the filed rate doctrine when the regulatory process does not require active approval of the filed rate, i.e., where all that is required is passive non-disapproval of the filed rate.  Brown v. Ticor Title Ins. Co., 982 F.2d 386, 393 (9th Cir. 1992); see also Wileman Bros. & Elliott v. Giannini, 909 F.2d 332, 337-38 (9th Cir. 1990).  In Brown, the plaintiffs filed a class action suit alleging that the defendant had violated the antitrust laws by participating in state-licensed rating bureaus that filed rates

with state administrative agencies.  Id. at 388.  The Ninth
Circuit focused on the regulatory regime's only requiring non-
disapproval of rates, rather than robust antecedent review and
express approval of them.  Id. at 394.  Brown held that the filed
rate doctrine did not apply because the rates the defendant filed
"were not subject to meaningful review by the state, [and thus]
the fact that they were filed does not render them immune from
challenge."  Id. at 394.

        Other than the Ninth Circuit in Brown, no other court
has taken such a narrow view of the applicability of the filed
rate doctrine.  The Supreme Court in Montana-Dakota stated that
the parties "can claim no rate as a legal right that is other
than the filed rate, whether fixed or merely accepted by the
[regulatory body]."  341 U.S. at 251 (emphasis added).  The
Eleventh Circuit in Taffet applied the filed rate doctrine after
an exhaustive description of the regulatory regimes at issue,
both of which were "file and use" regimes similar to Delaware's.
Taffet, 967 F.2d at 1490.  The district court in Wegoland
suggested that the filed rate doctrine might apply even if there
was no meaningful review of rates.  Wegoland, 806 F. Supp. 2d at
1120.

        But the relevant statute in Keogh mandated only that
the covered common carriers publish their rate increases with ten
days' public notice before they went into effect.  24 Stat. 381
(49th Cong. Feb. 4, 1887).  The statute empowered the ICC to
investigate the common carriers, suspend any rate increases, and

-12-

hold a hearing based on a filed complaint.  Id. at 383-84.  Much
like the modern "file and use" system in Delaware and other
jurisdictions throughout the United States, the statute in Keogh
did not require express approval of the rate before it went into
effect.  The same is true of the successor statute in Square D,
where Judge Friendly articulated the central question in that
case as "whether [Keogh] has been overruled so far as its
language extends to rates filed with but not investigated and
approved by the Interstate Commerce Commission."  Square D, 760
F.2d at 1349.

Our Court of Appeals has not ruled on whether the filed
rate doctrine applies only to those regulatory regimes that
expressly approve rates, and we do not believe it would so hold.
To engraft antecedent regulatory review as a condition precedent
to the doctrine's vitality would jeopardize every "file and use"
regulatory system, notwithstanding decades of practice since
Keogh was decided.

Although some courts have suggested that meaningful
review may not be a prerequisite for applying the filed rate
doctrine, Wegoland, 806 F. Supp. 2d at 1120, Delaware law and DOI
regulation establish that title insurance rates are indeed
subject to genuine review.  Delaware law states that "[t]he
Commissioner shall review filings as soon as reasonably possible
after they have been made in order to determine whether they meet
the requirements of this chapter."  18 Del. C. § 2506(a)
(emphasis added).  The Commissioner is obliged to consider

-13-

various factors and evidence in determining whether the rate
filed comports with the law and to ensure those rates are not
"excessive, inadequate or unfairly discriminatory." Id. §
2503(a).  The filing of regulated entities must include
information sufficient to justify the rate and a proposed
effective date.  Id. § 2504(b).  If such information is not
included with the filing, Delaware law mandates that the
Commissioner oblige the insurer to provide such information.  Id.
Although the DOI has no separate title insurance division or
certified public accountant assigned to review such information,
the DOI uses the services of an outside actuarial firm to review
its rate filings, and this compensates for any internal lack of
expertise.  Compl. ¶ 49; Bulletin No. 27.

        Delaware's regulatory regime thus amounts to meaningful
and competent review of rate filings to determine whether rates
comply with the statutory principles.  We therefore reject
plaintiffs' contentions to the contrary.

### ii.  **Comprehensiveness**

        Plaintiffs also argue that we should not apply the
filed rate doctrine because Delaware's regulatory regime is
insufficiently comprehensive.  They contend that the Delaware
regime fails to provide individuals like the plaintiffs with
monetary relief for rates the DOI accepted but that are later
found to be unreasonable or predicated on fraud.  Without this
type of relief, plaintiffs complain that their claims fall into a

-14-

regulatory lacuna, which counsels against applying the filed rate
doctrine.

Plaintiffs primarily rely on "price squeeze" cases in
support of their argument.  See, e.g., City of Kirkwood, 671 F.2d
at 1176; City of Mishawaka v. Indiana & Michigan Elec. Co., 560
F.2d 1314, 1321 (7th Cir. 1978).  A "price squeeze" claim
involves two rates, one wholesale and the other retail, each
regulated by different regulatory rate-setting bodies.  Such a
claim alleges that the defendant manipulated the different rates,
usually through the filing of wholesale rates, to extract a
competitive advantage against customers at the wholesale level
and competitors at the retail level.  Such a "price squeeze"
claim is not at issue here.

These "price squeeze" cases contain language that
plaintiffs contend confirm the inappropriateness of applying the
filed rate doctrine when "no single regulator has authority over
all the various rates."  Pl.'s Resp. at 18 (citing City of
Kirkwood, 671 F.2d at 1178-79; City of Mishawaka v. Amer. Elec.
Power Co., 616 F.2d 976, 983 (7th Cir. 1980)); see also City of
Mishawaka, 560 F.2d at 1321.  Courts in these instances refused
to apply the filed rate doctrine because the claim "falls within
a lacuna of state and federal regulation," i.e., no single
regulator was in a position to remedy such manipulation because
it involved a rate outside that regulator's control.  Borough of
Lansdale v. PP&L, Inc., 503 F. Supp. 2d 730, 736 (E.D. Pa. 2007)
(quoting 1A Areeda, Hovenkamp, & Elhauge, Antitrust Law ¶ 244e

-15-

(2d ed. 2004) (internal quotations omitted)).

But that is not the problem here.  The plaintiffs' claim falls into <u>no</u> regulatory lacuna.  There is but one regulatory authority here, the Delaware Department of Insurance, and it is fully empowered to regulate the one rate at issue here that involves title insurance premiums.  <u>See</u> <u>Levinson v. Delaware Compensation Rating Bureau, Inc.</u>, 616 A.2d 1182, 1188 (Del. 1992) ("the Commissioner has sole original jurisdiction to determine rates").  Thus, the "price squeeze" cases are beside the point.

To be sure, the application of the filed rate doctrine is indeed predicated on the existence of a comprehensive regulatory regime that affords sufficient relief to individuals like the plaintiffs.  <u>See</u> <u>Taffet</u>, 967 F.2d at 1490-94.  But in <u>Taffet</u>, the Eleventh Circuit examined the "file and use" electrical power rate-setting regimes in Georgia and Alabama, and found them comprehensive.  Both regimes permitted the rate-setting bodies to investigate the reasonableness of rates upon complaint.  <u>Id.</u> at 1490, 1491.  Both provided for administrative hearings to challenge the reasonableness of the rates.  <u>Id.</u>  Both provided review of administrative decisions by the state courts but did not let courts substitute their judgment about the reasonableness of the rates if <u>some</u> evidence justified the rate set.  <u>Id.</u>  Both regimes empowered the rate-setting bodies to suspend or disapprove a rate at any time as long as certain procedures were followed.  <u>Id.</u>  Neither system provided for money damages for rates later found to be unreasonable, but permitted

-16-

the rate-setting bodies to consider the previous unreasonableness when setting prospective rates.  Id. at 1492-93.

Delaware's insurance regulation regime is much the same as those considered in Taffet.  Any individual or organization that in good faith is "aggrieved with respect to any filing which is in effect" can make a written complaint to the Commissioner, who then must hold a hearing with notice to all potentially affected parties.  18 Del. C. § 2520.  If, after the hearing, the Commissioner determines that the rate in question does not comply with the law, then he or she may issue an order specifying the nature of the noncompliance and the date the rate will expire. Id.  Judicial review is available in the Delaware Chancery Court to "any person aggrieved" by "[a]ny order, decision or act of the Commissioner," but that review is limited to "review for error of law or lack of substantial evidence."  Id. § 2531; Levinson, 616 A.2d at 1191.  The Commissioner can direct an insurer to change its proposed rates to comply with the statutory scheme.  See Blue Cross and Blue Shield v. Elliot, 1977 WL 23810, at *1 (Del. Ch. April 13, 1977) (Commissioner "directed Blue Cross and Blue Shield to reduce proposed weighted average rate increases from an overall average of 21.4% to 12.15%").  Like the regulatory schemes considered in Taffet, the Commissioner's determination is prospective and does not "affect any contract or policy made or issued prior to the expiration of the period set forth in the order."  Matter of Surcharge Classification 0133 By Del. Compensation Rating Bureau, Inc., 655 A.2d 295, 299-300 (Del.

-17-

Super.), aff'd 665 A.2d 309 (Del. 1995).

We can find nothing explicitly authorizing or preventing the Commissioner of DOI from considering past fraud of a regulated entity when determining a reasonable, prospective rate.  From the lack of any legal restriction on the rate-setting bodies to consider past behavior, Taffet inferred that the rate-setting bodies had the power to consider past fraudulent rate filings when setting prospective rates.  967 F.2d at 1493 ("As in Alabama law, nothing in Georgia law forbids the [regulatory body] from setting prospective rates that are low enough to compensate consumers for excesses paid in the past because a [regulated entity] defrauded [the regulated body]").  Here, Delaware law seeks "to promote the public welfare by regulating insurance rates" and establish insurance rates that are not "excessive, inadequate or unfairly discriminatory."  18 Del. C. § 2501.  To that end, the Commissioner is obliged to give due consideration to "past and prospective loss experience within and outside this State" and "all other relevant factors within and outside this State."  Id. § 2503.

We see no obstacle in Delaware law that would prevent one from filing a complaint with the Commissioner and seeking prospective redress in the form of lower rates to compensate for filed rates that are later shown to have been excessive.  Thus, we find Delaware's regulatory regime, like those in Taffet, to be comprehensive for the purposes of applying the filed rate doctrine.

-18-

**4.   Compliance with Filing Requirements**
**and Fraud in the Rate-Making Process**

Lastly, plaintiffs argue that the filed rate doctrine should not apply because the defendants did not properly file their rate.  Plaintiffs have alleged that the defendants' filings included the cost of "kickbacks and other agency commission payments" as part of the filed rate, and failed to include cost data on agency commissions, thereby making their filing both fraudulent and procedurally noncompliant.  Compl. ¶¶ 47, 49.  Our Court of Appeals has held that there is no fraud-in-the-rate-setting exception to the filed rate doctrine.  AT&T Corp. v. JMC Telecom, LLC, 470 F.3d 525, 535 (3d Cir. 2006).  Therefore, we will concentrate exclusively on the plaintiffs' assertion that the defendants' filing with the DOI was procedurally noncompliant.

A regulated entity's procedural non-compliance with regulatory orders can make that entity liable for money damages despite the filed rate doctrine.  Security Services, Inc. v. K Mart Corp., 511 U.S. 431, 442 (1994); see also TON Services, Inc. v. Qwest Corp., 493 F.3d 1225, 1237 (10th Cir. 2007).

In Security Services, the defendant motor carrier had filed a rate with the ICC, which received and accepted it.  Id. at 433.  But the application made reference to, and relied on, a mileage guide filed by a rating agency to which the defendant belonged.  Id.  This mileage guide made reference to yet other rating agency filings.  Id.  Pursuant to ICC regulation, such

-19-

guides and supplemental materials only applied to those who were
participants in the rating agency.  _Id._ at 436-37.  After the
defendant had filed its rate with the ICC, the rating agency
cancelled the defendant's participation in the rating agency for
failure to pay the requisite fee.  _Id._ at 434.

      The Supreme Court held that from the moment the
cancellation of participation became effective, the defendant's
filed rate (and thus the filed rate doctrine) no longer applied
because the application became incomplete on its face, _i.e._, the
defendant could no longer rely on the mileage guide and the
supplemental materials, both of which were necessary to make the
application complete.  _Id._ at 441-42.  Failure to comply with
regulatory procedural requirements will make a filed rate
invalid, and once the filed rate ceases to apply, so does the
filed rate doctrine.

      In _TON Services_, the Tenth Circuit held that the filed
rate doctrine did not apply because of a more complex failure to
comply with regulatory procedure.  There, Congress had directed
the Federal Communications Commission to ensure that the
intrastate rate that telecommunications service providers charged
for payphones could not favor payphone service providers owned by
the rate-chargers.  _TON_, 493 F.3d at 1229.  The FCC then ordered
the telecommunications service providers to file cost-based
rates, accompanied by cost data, with the appropriate state
regulatory body.  _Id._ at 1230.

      On April 10, 1997, five days before this FCC order went

-20-

into effect, a coalition of telecommunications service providers
petitioned the FCC to delay the effective date because they were
not prepared to file cost-based rates and the necessary data.
Id. at 1231.  The FCC granted the coalition's request, but
ordered the telecommunications service providers to reimburse or
credit any payphone service providers not owned by the rate-
charger for the difference between the non-compliant rate and the
subsequently filed, complaint rate (if the latter rate was lower
than the former rate) for the period from April 15, 1997 to when
the rate-charger became fully compliant with the FCC's order to
file cost-based rates.  Id. at 1232.

From April of 1997 to April of 2002, the defendant in
TON had not filed either a rate or the required cost-data as the
FCC ordered.  Id. at 1234.  In 2002, the defendant filed new
rates and cost-data that were lower than those it was charging
since April of 1997.  Id.  The plaintiff sought to recover the
difference between the two rates for the period from April 15,
1997 and the day the later rate would go into effect.  Id.  The
defendant argued that the filed rate doctrine prevented recovery
of money damages because the defendant had filed its previous
rates with the appropriate regulatory body.  The Tenth Circuit
held that the filed rate doctrine did not apply because plaintiff
sought to enforce existing regulatory orders that made damages
available to those in the plaintiff's position.

In Security Services and TON, the filed rate doctrine
did not apply when the defendant failed to comply with regulatory

procedure or the plaintiff sought to enforce regulatory orders
already in place.  In the first instance, an invalid rate
application takes the regulated entity outside the purview of the
regulatory body, and, in the second, regulatory orders signal
that the relevant regulatory body authorizes damages and
specifies how they would be calculated.  In either case, the lack
of compliance with regulatory procedure eliminates the usual
justiciability concerns that underpin the filed rate doctrine.

         Here, the plaintiffs do not allege regulatory
noncompliance.  They contend that the defendants did not file any
of the cost data that DOI's loss cost regulations required.
Compl. ¶¶ 47, 49; Bulletin No. 5.  But the Commissioner
specifically waived the loss cost requirements in Bulletin No.
27, and required DTIRB to have a statistical plan in place to
collect that data.  When the defendants filed their rates, they
were not required to include the loss cost data and, thus, did
not fail to comply with the regulatory filing requirements.

         In short, the plaintiffs have not alleged that the
defendants have failed to comply with the regulatory procedures
in any other way.  Thus, their procedural noncompliance argument
fails.

         **5.**   **Injunctive Relief**

         Both the Supreme Court and the Second Circuit in Square
D suggested that equitable relief under the Sherman Act may
continue to be viable after a court applies the filed rate

doctrine.  Square D, 476 U.S. at 422 n.28 (noting that the
possible existence of injunctive relief was one of the reasons
that the filed rate doctrine did not amount to antitrust
immunity); Square D, 760 F.2d at 1364-66 (remanding to district
court to consider the possibility of injunctive relief).

        But courts have held that the filed rate doctrine
precludes injunctive relief when the injunctive relief seeks to
prevent the defendants from relying on the filed rate.  See,
e.g., Burlington Northern, Inc. v. United States, 459 U.S. 131,
138-142 (1982) (vacating injunction that ordered a reduction in
rates); Utility Dist 1 v. Dynergy Power Marketing, Inc., 384 F.3d
756, 761-62 (9th Cir. 2004) (denying injunction that would have
prevented defendants from using market dependent but filed
rates); Town of Norwood v. New England Power Co., 202 F.3d 408,
419-20 (1st Cir. 2000) (denying injunction that would in effect
block application of the rate charge at issue); UtilityChoice,
L.P. v. TXU Corp., 2005 WL 3307524, at *5-6 (S.D. Tex. Dec. 6,
2005) ("Plaintiffs' request for equitable relief cannot be
separated from acts affecting the rates Defendants' charge"); In
re California Wholesale Elec. Antitrust Litig., 244 F. Supp. 2d
1072, 1078 (S.D. Cal. 2003) (injunction denied because it sought
to block the application of filed rates).  Thus, the filed rate
doctrine bars injunctive relief insofar as it is an attempt to
avoid the effect of the doctrine, i.e., an injunction that
prevents the defendants from relying upon the filed rate.

        Plaintiffs do not describe in much detail the type of

-23-

injunctive relief they seek.  They simply state that they wish to enjoin the conduct that stems from "the unlawful contract, combination and conspiracy alleged in [the Sherman Act claim]." Compl., Prayer ¶ b; see also Compl. ¶¶ 60-61, 72.  As we have explained, we cannot grant injunctive relief that bars the defendants from using the filed rate.  This may not be the only type of relief that the plaintiffs seek, but we will not speculate on what they have in mind.  Instead, we shall dismiss their claim for injunctive relief as it is currently articulated, but grant leave to plaintiffs to amend their complaint to request injunctive relief that does not run afoul of the filed rate doctrine as we have just construed it.

> **B.   Sufficiency of Conspiracy Allegations**
> **Against Corporate Parent Defendants**

The defendants also move to dismiss the claims against the corporate parent defendants.  They argue that the plaintiffs have failed to allege sufficient facts from which we can infer that the corporate parent defendants entered into the alleged conspiracy.

Generally, "a parent corporation...is not liable for the acts of its subsidiaries."  United States v. Bestfoods, 524 U.S. 51, 61 (1998).  Moreover, one cannot "allege a [Sherman Act] conspiracy between a parent corporation and its subsidiary, because an agreement under the Sherman Act must be between separate, independent entities capable of combining their efforts to restrain trade."  In Re California Title Ins. Antitrust

-24-

Litig., 2009 WL 1458025, at *7 (N.D. Cal. May 21, 2009) (citing
Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 769-
771 (1984)).  Thus, for the plaintiffs to aver sufficient facts
to state a claim against a parent corporation they must aver
facts sufficient to infer either direct involvement or some
reason to pierce the corporate veil.

        Here, the plaintiffs allege that the corporate parent
defendants controlled their respective subsidiaries, and these
subsidiaries colluded to fix title insurance prices in Delaware.
Compl. ¶¶ 21, 23, 25, 27, 29, 31.  Plaintiffs maintain that they
have adequately alleged that the corporate parent defendants
conspired with one another to fix these prices, and their
subsidiaries are merely a mechanism to provide title insurance in
Delaware.  Pl.'s Resp. at 25.

        But that is not what they have alleged in their
complaint.  Plaintiffs allege that the defendants used DTIRB to
fix rates.  Compl. ¶¶ 1-8.  The only defendants who are members
of DTIRB are the title insurer defendants.  Compl. Ex. A.
Without some averment that the corporate parent defendants
directly entered into agreements, or the title insurer defendants
are the corporate parent defendants' alter egos, the plaintiffs
have not alleged enough to establish that the corporate parent
defendants entered into a conspiracy to fix title insurance
prices in Delaware.  We shall, therefore, dismiss the claims
against the corporate parent defendants, but grant plaintiffs
leave to amend their complaint to aver sufficient facts to state

-25-

a claim against these defendants if they can do so conformably
with Fed. R. Civ. P. 11 and the Copperweld jurisprudence.

                    BY THE COURT:

                    __\s\Stewart Dalzell