## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DAWN A. McCRAY, WILLIAM H. WILLIAMSON, and DARALICE GRAYO, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FIDELITY NATIONAL TITLE INSURANCE COMPANY, CHICAGO TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY OF FLORIDA, SECURITY UNION TITLE INSURANCE COMPANY, FIRST AMERICAN TITLE INSURANCE COMPANY, UNITED GENERAL TITLE INSURANCE COMPANY, T.A. TITLE INSURANCE COMPANY, CENSTAR TITLE INSURANCE COMPANY, COMMONWEALTH LAND TITLE INSURANCE COMPANY, LAWYERS TITLE INSURANCE CORPORATION, TRANSNATION TITLE INSURANCE COMPANY, STEWART TITLE GUARANTY COMPANY, OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY, and DELAWARE TITLE INSURANCE RATING BUREAU,<br><br>Defendants. | Case No. 1:08-cv-00775-SD<br><br><br>AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND |

Plaintiffs Dawn A. McCray, William H. Williamson and Daralice Grayo, on behalf of themselves and all others similarly situated, upon knowledge with respect to their own acts and upon information and belief, formed after an inquiry reasonable under the circumstances, with respect to all other matters, allege as follows:

## **PRELIMINARY STATEMENT**

1.     Plaintiffs challenge the defendants' collective price-setting of rates in the State of Delaware for title insurance as *per se* illegal price-fixing under federal antitrust laws and seek injunctive relief against the defendants due to the significant threat of future losses and injuries resulting from those antitrust violations.

2.     The Delaware Department of Insurance ("Department of Insurance") is the agency assigned to supervise, examine, and regulate title insurers and rating bureaus.   The Department of Insurance is charged with ensuring that insurance rates are not "excessive, inadequate, or unfairly discriminatory."   To that end, Delaware law requires title insurers, or a rating bureau on its behalf, to submit proposed rates and statistical information regarding losses and expenses to justify those rates to the Department of Insurance for review.   In doing so, Delaware law does not "prohibit, or encourage . . . uniformity in insurance rates, rating systems, rating plans, or practices."   Thus, Delaware law indicates no intention to displace competition with regulation.

3.     Defendants, which include the largest title insurance companies in the nation, collectively formed the Delaware Title Insurance Rating Bureau ("DTIRB") along with other title insurers.   DTIRB claims to collect loss and expense information from its members, and is required to submit such information to the Department of Insurance, along with its collectively-set title insurance rates.   DTIRB, however, requested and received an exemption from the requirement that it submit aggregated data, including premium, expense and loss cost data, in support of the rates members currently charge.

4.     Defendants' collectively fixed rates automatically become effective upon the date unilaterally selected by defendants (which may be the date of filing).   Thus, Delaware is a "file and use" jurisdiction in which title insurers are permitted to use a new rate upon, or within a self-

designated time after, filing without any requirement to either (1) first obtain regulatory approval of the rate; or (2) afford the Department of Insurance a sufficient period of time in which to evaluate the new rate before it goes into effect.

5.      Not only do defendants charge rates which the Department of Insurance has never had the opportunity to review, the Department is only permitted to disapprove of a rate within thirty days of the effective date set by defendants.  Thus, the Department of Insurance has only a narrow window of opportunity in which to exercise its limited regulatory function.

6.      Defendants have made it impossible for the Department of Insurance to review, regulate or supervise the reasonableness of the rates collectively set by Defendants during this narrow thirty-day window because those rates are based principally on undisclosed costs which the Department of Insurance has no ability to assess.  These "costs" include, among other things, kickbacks, referral fees and other expenses unrelated to the business of title insurance.

7.      By including such costs and by failing to provide an accounting of the vast majority of their claimed costs, defendants collectively have managed to deceive the Department of Insurance into not disapproving supra-competitive collectively set title insurance rates.  Those rates – which for a home or property purchaser may run one-thousand dollars or more – bear no reasonable relationship to the actual loss history or true cost of providing the title insurance.

8.      The ultimate purpose and effect of the defendants' unlawful conduct has been to increase the prices Delaware title insurance purchasers have paid, and will continue to pay, compared to what they would have paid absent defendants' joint illegal conduct.  Defendants have managed to earn returns vastly greater than those allowed for by law.  Plaintiffs bring this class action to enjoin defendants from engaging in anticompetitive, deceptive and unlawful

conduct in their future title insurance rate filings with the Department of Insurance, a practice which threatens Plaintiffs and the Class with significant losses and damages.

## JURISDICTION AND VENUE

9.      This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 16 of the Clayton Act, 15 U.S.C. § 26.

10.     Jurisdiction for this federal claim is based on Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337.

11.     Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c), because one or more of the defendants' principal places of business is here, because all defendants are found and transact business in this district, and/or the claims arose at least in part in this district.   The interstate trade and commerce described herein has been carried out, in part, within this district.

## INTERSTATE TRADE AND COMMERCE

12.     Defendants are sellers of title insurance in the State of Delaware and have sold, and continue to sell, substantial quantities of title insurance in a continuous and uninterrupted flow in interstate commerce.

13.     At all relevant times, Class members from locations outside the State of Delaware purchased commercial or residential property and title insurance within Delaware.

14.     At all relevant times, the defendants were the major sellers of title insurance in the United States and the State of Delaware.   Defendants controlled in excess of 90 percent of the market for title insurance in the United States and approximately 98 percent of the market for title insurance in the State of Delaware.   Total sales of title insurance by defendants exceeded $72 million in Delaware in 2007.

15.     As described herein, the unlawful activities of defendants and the unnamed co-conspirators have been within the flow of, and have had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## PARTIES

### A.   Plaintiffs

16.     Plaintiffs Dawn A. McCray and William H. Williamson are residents of Delaware who purchased title insurance from defendant First American Title Insurance Company in connection with the purchase of property in Wilmington, Delaware.  The price that Ms. McCray and Mr. Williamson paid for title insurance was inflated by defendants' anticompetitive, deceptive, and otherwise unlawful conduct.

17.     Plaintiff Daralice Grayo is a resident of Delaware who purchased title insurance from defendant Stewart Title Guaranty Company in connection with the purchase of property in Middletown, Delaware.   The price that Ms. Grayo paid for title insurance was inflated by defendants' anticompetitive, deceptive, and otherwise unlawful conduct.

### B.   Defendants

18.     Defendant Delaware Title Insurance Rating Bureau ("DTIRB") is an association of title insurers which claims to be licensed by the Department of Insurance pursuant to Del. Code Ann. tit. 18, § 2511.  DTIRB maintains its offices in Wayne, Pennsylvania.

19.     DTIRB claims to obtain, compile, and analyze statistical data from its members relating to their title insurance premiums, losses and expenses.  The association is required to submit certain of this information in aggregate form to the Department of Insurance, although to date it has not done so as it has sought and received a special exemption from doing so.  DTIRB also prepares and submits the Manual of Delaware Title Insurance Rating Bureau (attached as Exhibit A), which publishes collectively set title insurance rates agreed to be charged and rules to

be followed by DTIRB's members.  DTIRB's membership consists of title insurers, including those defendants that are licensed to issue title insurance policies in Delaware.

20.    The "Fidelity group" of title insurance companies – which includes defendant Fidelity National Title Insurance Company, defendant Chicago Title Insurance Company, defendant Ticor Title Insurance Company, defendant Ticor Title Insurance Company of Florida, defendant Security Union Title Insurance Company, and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including Delaware.  The insurers in the Fidelity group account for about 29 percent of the title insurance premiums nationally and 31 percent in Delaware.  The insurers in the Fidelity group are members of defendant DTIRB and have agreed with DTIRB and other defendants to charge title insurance rates in Delaware that DTIRB collectively sets.

21.    The "First American group" of title insurance companies – which includes defendant First American Title Insurance Company, defendant Censtar Title Insurance Company, defendant United General Title Insurance Company, defendant T.A. Title Insurance Company and their affiliates – sells title insurance to purchasers of commercial and residential real estate in the United States, including Delaware.  The insurers in the First American group account for about 27 percent of the title insurance premiums nationally and 25 percent in Delaware.  The insurers in the First American group are members of DTIRB and have agreed with DTIRB and other defendants to charge title insurance rates in Delaware that DTIRB collectively sets.

22.    The "LandAmerica group" of title insurance companies – which includes defendant Commonwealth Land Title Insurance Company, defendant Lawyers Title Insurance Corporation, defendant Transnation Title Insurance Company, and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the

United States, including Delaware.  The insurers in the LandAmerica group account for about 18 percent of title insurance premiums nationally and 31 percent in Delaware.  The insurers in the LandAmerica group are members of DTIRB and have agreed with DTIRB and other defendants to charge title insurance rates in Delaware that DTIRB collectively sets.

23.     The "Stewart group" of title insurance companies – which includes defendant Stewart Title Guaranty Company and its affiliates – is engaged in selling title insurance to purchasers of commercial or residential real estate throughout the United States, including Delaware.  The insurers in the Stewart group account for about 11 percent of the title insurance premiums nationally and 6 percent in Delaware.  The insurers in the Stewart group are members of DTIRB and have agreed with DTIRB and other defendants to charge title insurance rates in Delaware that DTIRB collectively sets.

24.     The "Old Republic group" of title insurance companies – which includes defendant Old Republic National Title Insurance Company and its affiliates – is engaged in selling title insurance to purchasers of commercial or residential real estate throughout the United States, including Delaware.  The insurers in the Old Republic group account for about 6 percent of the title insurance premiums nationally and 6 percent in Delaware.  The insurers in the Old Republic group are members of DTIRB and have agreed with DTIRB and other defendants to charge title insurance rates in Delaware that DTIRB collectively sets.

25.     Together, the Fidelity, First American, LandAmerica, Stewart, and Old Republic groups of title insurers account for over 90 percent of the title premiums paid nationally and approximately 98 percent of the premiums paid in Delaware.

26.     Rather than setting their own individual title insurance rates, defendants have affirmatively chosen to become members of DTIRB and, through DTIRB, jointly communicate

and set uniform rates.   The Fidelity, First American, LandAmerica, Stewart, and Old Republic groups of title insurers collectively represent 10 of the 11 members of DTIRB disclosed in its 2004 rating manual.   These defendants control the operations of DTIRB and DTIRB's collective rate-setting activity.   At all relevant times, defendants have met and collectively agreed to charge Delaware title insurance consumers uniform rates that they have collectively set through DTIRB.

## C.      Co-Conspirators

27.     Various other persons, firms and corporations not made defendants herein have participated as co-conspirators with the defendants in the violations alleged herein and have performed acts and made statements in furtherance thereof.   These co-conspirators include the various title insurers, not named as defendants herein, which were members of DTIRB during the relevant time period.

## FACTS

28.     Title insurance is one of the most expensive items associated with the closing of a real estate transaction.

29.     Title insurers do not compete on the basis of the policies or coverage that they provide.   In fact, almost all title policies are based on a single set of form policies published and maintained by the national trade association, the American Land Title Association.   As a result, title insurance is a commodity product.

30.     Title insurance is almost always required by lenders for a residential or commercial property purchaser to obtain a mortgage.   It protects the lender up to the amount of the mortgage ("loan policy").   A purchaser usually also buys title insurance to protect the purchaser for the purchaser's interest in the property ("owner's policy").   There is a one-time premium.

31.     Title insurance protects a purchaser from loss from defects in title that already exist at the time of purchase.  Title insurance is issued primarily through title agents, many of whom are owned or otherwise controlled by the defendant title insurers.  Before issuing a policy, a title agent checks the history of a title by examining public records such as deeds, mortgages, wills, divorce decrees, court judgments and tax records.  The end goal of a title search is not to provide coverage for title defects that the search uncovers, but rather to exclude coverage for any such defects.  This reduces the real value of the title policy which is written to cover only *undiscovered* defects in title at the time of issuance.

32.     The title insurance policy warrants that the title examination was complete and accurate.  In the event a title defect is uncovered after the issuance of the policy, the title insurer will pay to defend against an attack on the title and/or pay valid claims.  Thus, title insurance is, in essence, a limited warranty against undiscovered past activities that have caused defects in title discovered after the purchase.  It is unlike property and casualty insurance, such as homeowners insurance, which insure against future unknown losses and have annual premiums.  In short, title insurance is not insurance in the traditional sense of insuring, i.e., spreading risk, against future loss for events yet to occur.  Issuing title insurance policies is, therefore, not the "business of insurance" within the meaning of the McCarran-Ferguson Act, 15 U.S.C. §§ 1011, *et seq*.

33.     Because title insurance warrants against prior events that cause defects in title, which ordinarily are identified and excluded from the policy's coverage, the title insurance industry pays out in claims a very low percentage of the premiums collected.  Consequently, title insurers (according to Fitch, a credit rating firm) average just 5 cents in claims for every dollar collected in premiums.  That figure is even lower in Delaware.  In contrast, property and casualty insurers pay out roughly 87 cents for every dollar collected.

## A.     Collective Price-Setting Through DTIRB

34.     Delaware requires a title insurer to file its rates with the Department of Insurance. It is one of only a very small number of states in which an insurer may satisfy that obligation by becoming a member of a licensed rating bureau.  Delaware law, however, does not authorize or require title insurers to use the rating bureau to collectively fix a single uniform rate.  Title 18, section 2501 of the Delaware Code specifically states that Delaware's insurance regulations are not intended "(1) to prohibit or discourage reasonable competition, or (2) to prohibit, or encourage . . . uniformity in insurance rates, rating systems, rating plans or practices."

35.     Nevertheless, defendants collectively fix and file a uniform schedule of title insurance rates through DTIRB.   DTIRB reportedly collects revenue, expense and loss information from defendants and from DTIRB's other members and DTIRB submits a uniform schedule of title insurance rates to the Department of Insurance.  The rate schedule published by DTIRB is "binding upon all members of and subscribers to DTIRB and their agents and must be used on and after the effective date" of publication, unless a specific deviation has been granted. *See* Exhibit A at introductory page (following cover page).  Through this process, defendants charge identical and collectively fixed rates to title insurance purchasers.

36.     DTIRB's collectively set rates include a "risk premium," which is the portion of the total cost of title insurance attributable to the assumption by the title insurance company of its limited warranty provided by the issuance of the title insurance policy, as well as other costs.  The rates set forth in DTIRB's rating manual, however, purport not to "include charges for searches, abstracts, attorney's' [sic] fees, escrow or closing services or other services charged by attorneys, abstractors, etc."  *See* Exhibit A at Definitions 1.5.  Charges made for such services are in addition to the rates set by DTIRB.

37.     DTIRB's collectively fixed rates for title insurance are based on a percentage of the full value of the property.  These uniform rates are set forth in DTIRB's rating manual and on many of defendants' websites.  *See, e.g.*, www.oldrepublic.com; www.ratecalculator.fntg.com. For owners' policies on residential properties, this price ranges from about $950 (for a $300,000 policy) to $3,050 (for a $1 million policy).  For lenders' policies on residential properties, title insurance rates range from $650 (for a $300,000 policy) to $2,050 (for a $1 million policy), or a flat $25 if issued simultaneously with the owner's policy.  These prices are even higher for more expensive homes and commercial properties.  Title insurers collected premiums in excess of $72 million in 2007 in Delaware, most of which went to defendants and their affiliates.

**B.      Costs Unrelated to the Business of Insurance**

38.     The manner in which the title insurance industry operates has fueled defendants' conspiracy.  The most effective way for a particular title insurer to get business is to encourage the real estate middlemen – builders, brokers, and lenders – to steer business to that insurer.  The best way to so motivate these third-party representatives is not through lower prices (that they are not even paying).  Rather, it is through kickbacks in the form of finder's fees, gifts, and other financial enticements.  Therefore, it is higher, collusive pricing (which allows for this third-party consideration), not lower pricing, which provides the best way for title insurers to increase their business.

39.     Services performed by title agents in connection with the issuance of title insurance and property settlements, including charges for title search, title examination, closing, or escrow services, are not included in the rates set by DTIRB for title insurance.  Instead, title agents impose separate charges for each of these services performed.

40.     Despite the separate provision of fees for services performed, the bulk of the premiums agreed upon and submitted to the Department of Insurance by DTIRB consists of costs unrelated to the issuance of title insurance, including kickbacks and other financial inducements title insurers provide to title agents and indirectly (through title agents) to builders, brokers, and lenders.

41.     The improper payments to title agents do not simply work to steer business to defendants.  The payments also serve to boost defendants' own profits through the inflated revenues they obtain to cover these agency payments and through their ownership or management stake in many of these agencies.

42.     There is no provision under Delaware law for DTIRB to include kickbacks and other agency commission payments unrelated to the issuance of title insurance in its collectively fixed rates.  These payments have nothing to do with the issuance of title insurance or the business of insurance and are made by title insurers merely to inflate their revenues and as an inducement to steer business their way.

**C.     Lack of Regulatory Supervision**

43.     Under the current regulatory regime, the Department of Insurance should ensure that rates are not "excessive, inadequate, or unfairly discriminatory."  To exercise its regulatory function, therefore, the Department of Insurance must have accurate information regarding the basis and justification for the collectively set rates including historical information regarding title insurers' losses and expenses.  Defendants, however, have not provided specific premium, expense and loss cost data to support those rates to the Department of Insurance, instead filing their collectively fixed rates through DTIRB with no supporting data.

44.     The Department of Insurance, moreover, lacks the ability to – and therefore does not – attempt to review title insurers' costs.  The Department of Insurance has no separate

administrative title insurance division and has no certified public accountant assigned to systematically review the information provided by DTIRB or demand additional information in support of DTIRB's filings.   In fact, the Department of Insurance granted DTIRB a special exemption from the requirement that it disclose historic data regarding title insurers' expenses and losses to support the rates title insurers currently charge.   Accordingly, the Department of Insurance cannot properly review, and has not properly reviewed, the alleged bases for DTIRB's collectively set rates.

45.     The recognition that state regulators cannot effectively supervise and have not effectively supervised title insurance rate-setting activity in Delaware is consistent with the April 2007 findings of the GAO that the title insurance industry is in need of greater state regulation and oversight.   The GAO studied the industry conditions of several states and concluded that "state regulators have not collected the type of data, primarily on title agents' costs and operations, needed to analyze premium prices and underlying costs."

46.     Unchecked by regulatory review and insulated from competition, defendants have thus been able to collectively fix title insurance rates at supra-competitive levels and/or earn profits that vastly exceed those that would have resulted in an open, competitive market.

**D.     Lack of Competition in the Title Insurance Industry**

47.     The GAO, in its 2007 report entitled "Actions Needed to Improve Oversight of the Title Insurance Industry and Better Protect Consumers," found several indicia of a lack of competition in the industry, including:

- Consumers find it difficult to shop for title insurance, therefore, they put little pressure on insurers and agents to compete based on price;

- Title agents do not market to consumers, who pay for title insurance, but to those in the position to refer consumers to particular title agents, thus creating potential conflicts of interest;

- A number of recent investigations by HUD and state regulatory officials have identified instances of alleged illegal activities within the title industry that appear to reduce price competition and could indicate excessive prices; and

- As property values or loan amounts increase, prices paid for title insurance by consumers appear to increase faster than insurers' and agents' costs.

48. Title insurance industry officials tend to justify the price of title insurance by the alleged high cost of title searching back into the distant past. DTIRB's rates, however, purport not to include title search and examination charges. Moreover, a high proportion of noncommercial properties are searched only through the most recent transaction – at very little actual cost to defendants.

49. Title searches have become less labor intensive, especially in large urban counties and cities. More and more of the information is available electronically. The statistical likelihood that a title default would be overlooked is apparently so small that many transactions are now insured on the basis of a search of the last owner's title history or a search into transactions that occurred during the last twenty-five to thirty-five years. Thus, the risk of loss has decreased as well as the costs of production, yet none of these factors has resulted in price competition at the consumer level.

50. There is a remarkable absence of rate changes by title insurers over the past several years despite declining costs and risk of loss, increased number of transactions, and increased revenue per transaction. Defendants' current rates, for example, have been in place since February 2004 without any change. The prices charged by title insurers, therefore, are not responsive to the changing risk and costs or increasing revenue per transaction.

51. The title companies engage in illegal kickbacks, referral fees and other payments where the title insurer or the underwriter title company provides money, free services or other things of value to a real estate agent, a lender, a homebuilder or others in exchange for business

referrals.  These illegal kickbacks, referral fees and payments show that title insurance rates are supra-competitive.

52.    The title insurance market is highly concentrated – a relatively few title insurers account for the vast majority of title insurance sales.  Defendants, for example, account for approximately 98 percent of the premiums paid in Delaware.  Moreover, a large barrier to entry exists due to the established relationships between the entities that can steer consumers' title and escrow business and the entities who sell title insurance and escrow services.

53.    The agreement not to compete based on price is also evidenced by the fact that no defendant markets its services to consumers, the ultimate purchasers of the product.  That is in marked contrast to property and casualty insurance.

### THE ONGOING EFFECTS OF DEFENDANTS' ILLEGAL, DECEPTIVE AND UNFAIR ACTS AND PRACTICES

54.    Through deceptive and consumer-directed conduct, defendants have overcharged, and continue to overcharge, customers who purchase title insurance policies.  Kickbacks, referral fees and other improper payments are not sanctioned by the Department of Insurance.  The insurers do not reveal these payments to customers or to the Department of Insurance.

55.    Because the title insurance contracts are contracts of adhesion, defendants force their customers to accept the excessive premiums.  Consumers must purchase a title insurance policy if their purchase is financed in part with a mortgage.  Defendants' customers have no alternative than to purchase from defendants at the prices that were collectively set by the defendants through DTIRB.

56.    The patterns of deceptive conduct by defendants have had, and continue to have, the following effects, among others, which occur throughout Delaware:

(a)    Consumers are deceived and deprived of the benefits of normal, competitive title insurance premiums; and

15

(b)     Consumers are deceived into paying artificially high and non-competitive prices.

57.     As long as defendants engage in collective rate setting, defendants will continue to deceive Delaware consumers and be able to charge non-competitive prices for title insurance policies.   Plaintiffs and the Class of Delaware consumers will continue to face threatened monetary loss or damage by defendants' violations of the antitrust laws.

## CLASS ACTION ALLEGATIONS

58.     Plaintiffs bring this action as a class action under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of themselves and others similarly situated.   The "Class" is defined as:

> All persons or entities who, in the future, purchase title insurance policies directly from the defendants in connection with real property in the State of Delaware (the "Class").

59.     The Class is so numerous that joinder of all members is impracticable.   Due to the nature of the trade or the commerce involved, the members of the Class are geographically dispersed throughout the State of Delaware, and joinder of all Class members would be impracticable. While the exact number of Class members is unknown to plaintiffs at this time, plaintiffs believe that the Class will number well in excess of thousands of members..

60.     Plaintiffs' claims are typical of the claims of the other Class members.   Plaintiffs and Class members have previously purchased, and expect to again purchase, title insurance in Delaware at artificially maintained, non-competitive prices established by the actions of defendants in connection with the restraint of trade alleged herein.   Plaintiffs sustained damage in that they paid inflated prices for title insurance.   Plaintiffs and the Class will sustain future damages if again forced to pay collusive and inflated prices for title insurance.

61.     Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class action and antitrust litigation.

62.     Common questions of law and fact exist as to all Class members, which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the sale of title insurance constitutes the business of insurance for purposes of the McCarran-Ferguson Act;

(b)     Whether defendants contract, combine, or conspire with others, for the purpose of and with the effect of raising, fixing, maintaining, pegging, or stabilizing the price of title insurance for purchase by plaintiffs and the Class members; and

(c)     Whether defendants' continuing conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1, threatening loss or damage to the business or property of plaintiffs and the Class members;

(d)     Whether defendants' continuing conduct supports injunctive relief pursuant to 15 U.S.C. § 26;

63.     Defendants, the parties opposing the Class, have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

64.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. The prosecution of separate actions by individual Class members would impose heavy burdens upon the courts and defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

65.     The interest of Class members in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Class has a high degree of cohesion with respect to its members' grievances, rights, and interests to warrant adjudication by representation, and prosecution of the action through representatives would be unobjectionable.  The amounts at stake for Class members, while substantial in the aggregate, may not be great enough individually to enable them to maintain separate suits against defendants.  Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

## COUNT I

**Injunctive Relief for Violations of Section 1 of the Sherman Act, 15 U.S.C. § 1**

66.     Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

67.     Defendants and the unnamed co-conspirators entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

68.     The contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among defendants in furtherance of which defendants fix, maintain, and standardize prices for title insurance policies.  Such contract, combination or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

69.     Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurs in or affects interstate commerce.  Defendants' unlawful conduct operates through mutual understandings, combinations or agreements by, between and among defendants and other unnamed co-conspirators.  These other co-conspirators have either acted

18

willingly or, due to coercion, unwillingly, in furtherance of the unlawful restraint of trade alleged herein.

70.     The contract, combination or conspiracy has had, and will continue to have, the following effects:

(a)     prices charged to plaintiffs and the Class for title insurance policies are fixed or stabilized at higher, artificially derived, non-competitive levels;

(b)     plaintiffs and the Class are deprived of the benefits of free, open and unrestricted competition in the market for title insurance policies; and

(c)     competition in establishing the prices paid, customers, and territories for title insurance policies are unlawfully restrained, suppressed and eliminated..

71.     As a proximate result of defendants' unlawful conduct, plaintiffs and the Class will suffer future loss or damages in that they will be required to pay supra-competitive prices for title insurance policies.   Plaintiffs and the Class will thus suffer irreparable harm if injunctive relief is not granted.

72.     In the absence of a final injunction, the remedies available at law to Plaintiffs and the Class are inadequate to compensate them for defendants' collusive practices and supra-competitive prices for title insurance policies.

73.     Considering the balance of hardships between the parties, the irreparable harm to Plaintiffs and the Class outweighs any harm to the defendants if an injunction is granted.

74.     Moreover, a final injunction barring defendants' collusive practices will serve the public interest.

75.     The contract, combination or conspiracy threatens future loss or damage to Plaintiffs and the Class and warrants injunctive relief under the Sherman Act, 15 U.S.C.S. § 26.

## DEMAND FOR JURY TRIAL

76. Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, plaintiffs demand a jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs and the Class pray for judgment against defendants, as follows:

a. That the Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure, that plaintiffs be appointed as class representatives, that plaintiffs' counsel be appointed as counsel for the Class, and that appropriate notice of this action be given to each and every member of the Class as provided for by Rule 23(c)(2)(A);

b. That the unlawful contract, combination and conspiracy alleged herein – the collective rate setting of title insurance rates -- be adjudged and decreed to be a *per se* illegal violation of Section 1 of the Sherman Act and that such unlawful conduct be enjoined;

c. That the unlawful contract, combination and conspiracy alleged herein be adjudged and decreed to threaten future loss or damage in violation of Section 16 of the Clayton Act, 15 U.S.C.A. § 26;

d. That a final injunction issue enjoining defendants from engaging in collective rate setting with regard to all future title insurance rate filings with the Delaware Department of Insurance.

e. That plaintiffs and the Class recover their costs of the suit, including reasonable attorneys' fees, as provided by law;

f. That the Court grant such other and further relief as it deems just and proper.

By: /s/John S. Spadaro
    John S. Spadaro, No. 3155
    JOHN SHEEHAN SPADARO, LLC
    724 Yorklyn Road, Suite 375
    Stone Mill Office Park
    Hockessin, Delaware 19707
    TEL:  (302) 235-7745
    FAX: (302) 235-2536

**Of Counsel:**

Richard M. Hagstrom
James S. Reece
Michael E. Jacobs
Aaron M. McParlan
ZELLE, HOFMANN, VOELBEL, MASON & GETTE LLP
500 Washington Ave. S., Suite 4000
Minneapolis, Minnesota  55415
TEL:  (612) 339-2020
FAX: (612) 336-9100

- and -

Vincent J. Esades
Barbara J. Felt
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN  55403
TEL: (612) 338-4605
FAX: (612) 338-4692

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x

DAWN A. McCRAY, WILLIAM H.
WILLIAMSON, and DARALICE GRAYO, on
behalf of themselves and all others similarly situated,

                Plaintiffs,               Civil Action No. 1:08-cv-00775-SD

     v.

FIDELITY NATIONAL TITLE INSURANCE
COMPANY, et al.,

                Defendants.

---------------------------------------------------------------x

### NOTICE OF SERVICE

    I, John S. Spadaro, hereby certify that on this date I caused true and correct copies of the

foregoing document to be served on all counsel of record by electronic filing.

                           JOHN SHEEHAN SPADARO, LLC

                           /s/ John S. Spadaro
                           John S. Spadaro, No. 3155
                           724 Yorklyn Road, Suite 375
                           Hockessin, DE 19707
                           (302)235-7745

                           Attorney for Dawn A. McCray, William H.
                           Williamson and Darlice Grayo,
                           on behalf of themselves and all others
                           similarly situated

July 31, 2009

2962