```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE

DAWN A. MCCRAY, et al.        :      CIVIL ACTION
                              :
     v.                       :
                              :
FIDELITY NATIONAL TITLE       :
INSURANCE COMPANY, et al.     :      NO. 08-775
```

<u>MEMORANDUM</u>

Dalzell, J.[1]                                         July 29, 2010

       In this putative class action, plaintiffs allege that the twenty defendants conspired with one another to fix the price of title insurance in Delaware.  These defendants include (1) the defendant rating bureau, Delaware Title Insurance Rating Bureau, (2) the corporate parent defendants, Fidelity National Financial, Inc., First American Corporation, Stewart Information Services Corporation, Old Republic International Corporation, and the LandAmerica Financial Group, and (3) most of the remaining fourteen defendants -- the title insurer defendants -- that are subsidiaries of the corporate parent defendants.

       We previously granted defendants' motion to dismiss with prejudice plaintiffs' claims for damages under Section 1 of the Sherman Act and for unjust enrichment.  We also dismissed plaintiffs' claim for injunctive relief, giving them leave to replead.  Plaintiffs thereupon submitted an amended complaint with one Sherman Act claim for injunctive relief without pleading any facts that connect the actions of the parent companies to the alleged wrongdoing of their subsidiary title insurers.  The defendants now move to dismiss the amended complaint pursuant to

---

[1]Sitting by designation pursuant to 28 U.S.C. § 292(b).

Fed. R. Civ. P. 12(b)(6). We shall grant this motion and close the case for the reasons articulated below.

## I. **Factual Background**

In Delaware, the Department of Insurance ("DOI") regulates title insurance.[2] 18 Del. C. § 2502 (West 2009). Title insurers are required to file their rates with the DOI. Id. § 2504(a). Delaware is a "file and use" state, i.e., the insurers file their rates with the DOI and begin to charge them after the effective date stated in their filings, unless the Commissioner disapproves the rates. Am. Compl. ¶ 4; 18 Del. C. § 2506(a) ("[Rate] filings shall be deemed to meet the requirements of this chapter unless disapproved by the Commissioner"); Elliott v. Blue Cross & Blue Shield of Delaware, Inc., 463 A.2d 273, 274 (Del. 1983).

Delaware law permits insurers to comply with its rate filing requirements through membership in a licensed rating bureau. 18 Del. C. §§ 2510-12. The title insurer defendants here are all members of defendant Delaware Title Insurance Rating Bureau ("DTIRB"). Am. Compl. ¶¶ 3, 26. DTIRB is a licensed rating bureau that "obtain[s], compile[s], and analyze[s] statistical data from its members relating to their title

---

[2]Title insurance is coverage that mortgage lenders often oblige real property purchasers to buy before issuing them a mortgage. Am. Compl. ¶ 30. The insurance only covers defects in the title that are unknown at the time the policy is issued, and the price of the policy is usually based on the property's cost. Id. ¶¶ 31, 37.

insurance premiums, losses and expenses." Id. ¶ 19. DTIRB has made only one rate filing with the DOI, with an effective date of February 1, 2004. Am. Compl. ¶ 50, Ex. A.

The DOI obliges all rating bureaus to file "advisory prospective loss costs and supporting actuarial and statistical data" rather than simply filing advisory, final rates. Delaware Department of Insurance, Forms and Rates Bulletin No. 5, Lost Cost Filing Requirements (Nov. 27, 1995) ("Bulletin No. 5")[3]. The DOI mandates that "[e]ach insurer must individually determine and file the rates it will use as a result of its own independent company decision-making process. Advisory/rating organizations will continue to develop and file rules, relativity, and supplementary rating information on behalf of their participating insurers." Id. This regulation requires that each member of a rating bureau should file its own rates, but allows the members' rate filings, as a predicate to their individual rates, to reference rating information that the rating bureau has filed with the DOI.

On November 14, 2003, before the first DTIRB filing went into effect, the DOI Commissioner, at DTIRB's request, exempted DTIRB members from filing rates in accordance with Bulletin No. 5, specifically the requirement to file loss cost data, because "there [was] no credible historic data,

---

[3]We have already taken judicial notice of Bulletin No. 5 and Bulletin No. 27 (see infra) because they are public records of a state administrative agency. Anspach ex rel. Anspach v. City of Philadelphia, 503 F.3d 256, 273 n.11 (3d Cir. 2007).

particularly with regard to expenses, that the rating bureau could use in preparing the initial rates."[4]  Delaware Department of Insurance, Forms and Rates Bulletin No. 27, Title Insurance Filing Requirements (Nov. 14, 2003) ("Bulletin No. 27"). Although the Commissioner exempted DTIRB members from certain Bulletin No. 5 filing requirements, she ordered that by February 1, 2004, DTIRB "must have an approved statistical plan in place ... [which would] allow for collection and aggregation of sufficient premium, loss and expense data to enable the [DOI] to monitor rate adequacy."  Id.

> The plaintiffs allege that the title insurer defendants used DTIRB as a mechanism to set uniform rates and, at the behest of the title insurer defendants, that DTIRB improperly included in its rate calculation the cost of "kickbacks in the form of finder's fees, gifts, and other financial enticements."  Am. Compl. ¶¶ 38, 51.  The plaintiffs aver that the title insurance industry is highly concentrated and noncompetitive (defendants account for 98% of the premiums paid in Delaware), and despite growing efficiencies and profit margins, the rates have not changed since 2004.  Id. ¶¶ 50, 52.  In contrast with property and casualty insurance, these defendants do not market insurance to ultimate purchasers, and plaintiffs claim that this is further

---

[4] DTIRB's request was made pursuant to 18 Del. C. § 2505, which provides that "the Commissioner may, by written order, suspend or modify the requirement of filing as to any kind of insurance, subdivision or combination thereof, or as to classes of risks, the rates for which cannot practicably be filed before they are used."

evidence of an agreement not to compete. Id. ¶ 53.

## II. **Analysis**[5]

As noted, plaintiffs allege that, through DTIRB, the defendants entered into an agreement to fix title insurance prices in Delaware, which plaintiffs claim is per se illegal

---

[5] To survive a motion to dismiss, a party's factual allegations must raise a right to relief above the speculative level, and a complaint must allege facts suggestive of illegal conduct. Bell Atlantic v. Twombly, 550 U.S. 544, 563 n.8 (2007); Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008) (citing Twombly). The Supreme Court recently clarified the Twombly standard in Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009), where it held that a complaint must contain sufficient factual matter to state a claim for relief that is "plausible on its face." Iqbal, 129 S.Ct. at 1949 (internal quotations omitted). A claim has facial plausibility when the plaintiff pleads facts sufficient to allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. The plausibility standard is not as demanding as a "probability requirement," but it does oblige a plaintiff to allege facts sufficient to show that there is more than the mere possibility that a defendant has acted unlawfully. Id. (internal quotations omitted).

The Supreme Court in Iqbal established two principles that now underlie the Rule 12(b)(6) inquiry. First, although a court must accept as true the factual allegations in a complaint, this does not extend to legal conclusions. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Second, a complaint must state a plausible claim for relief to survive a motion to dismiss. Id. at 1950. Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. If the well-pleaded facts allege, but do not "show," more than the mere possibility of misconduct, then the pleader is not entitled to relief within the meaning of Rule 8(a)(2). Id.

In deciding a motion to dismiss, "courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim. A document forms the basis of a claim if the document is 'integral to or explicitly relied upon in the complaint.'" Lum v. Bank of America, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (internal citations omitted).

price-fixing.  In their amended complaint, plaintiffs assert only a claim for injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, Am. Compl. ¶¶ 66-75, which we granted them leave to do if they could do so without running afoul of the fixed rate doctrine.  We also granted them leave to amend their complaint to allege sufficient facts to state a claim against the corporate parent defendants, but this they have declined to do.  The defendants contend that we should dismiss the plaintiffs' complaint because their claim is barred by the McCarran-Ferguson Act, the state action doctrine, and the <u>Burford</u> abstention doctrine.

### A.  **The McCarran-Ferguson Act**

The McCarran-Ferguson Act confers antitrust immunity over the "business of insurance" to the extent that it is regulated by state law.  <u>F.T.C. v. Ticor Title Ins. Co.</u>, 504 U.S. 621, 627 (1992).  The McCarran-Ferguson Act provides, in pertinent part: "The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business," 15 U.S.C. § 1012(a), and that "[t]he Sherman Act. . . shall be applicable to the business of insurance to the extent that such business is not regulated by State law," 15 U.S.C. § 1012(b).  More specifically, the McCarran-Ferguson Act exempts from antitrust liability conduct that (1) constitutes the "business of insurance," (2) to the extent that conduct is

"regulated by State law," provided that the complained-of conduct is not (3) an "agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation." 15 U.S.C. § 1012(b); 15 U.S.C. § 1013(b). Plaintiffs do not allege any agreement to boycott, coerce or intimidate on the part of defendants. Thus, we need only examine whether the complained-of conduct is the "business of insurance" and whether that conduct is regulated by Delaware law.

       1.   The "Business of Insurance"

Plaintiffs claim that their Sherman Act claim is not preempted by the McCarran-Ferguson Act because the Sherman Act does not "invalidate, impair, or supersede" Delaware title insurance laws. 15 U.S.C. § 1012(b). But their reliance on Humana v. Forsyth, 525 U.S. 299, 307 (1999), and Weiss v. First Unum Life Ins. Co., 482 F.3d 254, 269 (3d Cir. 2007), is misplaced. In Humana, the Supreme Court found that RICO did not impair Nevada law and that therefore the McCarran-Ferguson Act did not apply (our Court of Appeals relied on Humana to decide Weiss -- also a RICO case). Here, it is the Sherman Act, not RICO, that is at issue, and "the language of the [McCarran-Ferguson] Act distinguishes preclusion analysis where [federal] antitrust laws are at issue." Sabo v. Metro. Life Ins. Co., 137 F.3d 185, 189 n.1 (3d Cir. 1998)(citing United States Dept. of the Treasury v. Fabe, 508 U.S. 491, 504 (1993)). The Supreme Court, however, has construed Section 1012(b) narrowly, and found that the protections of the McCarran-Ferguson Act extend only to

the "business of insurance," but not the "business of insurance companies." Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 132 (1982); Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 211 (1979).

Thus, we must first consider whether the activity complained of constitutes the "business of insurance." Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 166 (3d Cir. 2001). A given practice constitutes the "business of insurance" if (1) the practice has the effect of transferring or spreading a policyholder's risk, (2) the practice is an integral part of the policy relationship between the insurer and the insured, and (3) the practice is limited to entities within the insurance industry. Ticor Title Ins. Co. v. F.T.C., 998 F.2d 1129, 1133 (3d Cir. 1993)(quoting Pireno).

This case is almost identical in nature to In re New Jersey Title Ins. Litigation, No. 08-1425, 2010 WL 2710570 at *8-*9 (D.N.J. Jul. 6, 2010), in which title insurance purchaser plaintiffs sued various title insurance provider defendants who were members of the New Jersey Land Title Insurance Rating Bureau. In that case, with regard to the first Pireno factor, plaintiffs claimed that defendants' conduct had no relation to the pooling or spreading of risk because title insurance is more like a limited warranty than a type of insurance. But those plaintiffs admitted that title insurance policies do involve a risk component. Id. at *8. Here, plaintiffs make the same argument, Pl. Resp. at 19-20, and the same admission. Id. at 21

-8-

("Of course, there may be some 'hidden risks' which could not be discovered through a diligent title search"). This risk is enough to satisfy the first Pireno factor. In re New Jersey Title Ins. Litig., 2010 WL 2710570 at *9 ("While the risk component may comprise only a small portion of title insurance rates, there is no dispute that the title insurer assumes some risk when it issues a policy: the risk of an undetected title defect."); In re Title Insurance Antitrust Cases, No. 08-677, 2010 WL 1267129 at *27 (N.D. Ohio Mar. 31, 2010)(rejecting the argument that title insurance is more akin to a warranty or a guarantee); see also FTC v. Ticor Title Ins. Co., 504 U.S. 621, 625 (1992)("A title insurance policy insures against certain losses or damages sustained by reason of a defect in title not shown on the policy or title report to which it refers").

With regard to the second and third Pireno factors, plaintiffs claim that the "bulk of the title insurance premiums collusively fixed by Defendants are based on costs relating to commissions retained by title insurance agents." Pl. Resp. at 20; Am. Compl. ¶¶ 39-42. In In re New Jersey Title Ins. Litig., the plaintiffs only named title insurers as defendants and the prayer for relief sought to enjoin the defendants from engaging in collective rate setting with regard to all future title insurance rate filings with the New Jersey Department of Banking and Insurance. The District of New Jersey found that this satisfied the second and third Pireno factors.

Similarly here, the plaintiffs only name as defendants

title insurers and the Delaware Title Insurance Rating Bureau, and the prayer for relief seeks to enjoin these defendants from engaging in collective rate setting with regard to all future title insurance rate filings with the DOI. Am. Compl. Prayer for Relief ¶ (d). Certainly, plaintiffs' Sherman Act claim challenges the rate-making process for title insurance policies. Other courts have held the setting of rates to be the "business of insurance." Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 250 (1979); Gilchrist v. State Farm Mut. Auto. Ins. Co., 390 F.3d 1327, 1331 (11th Cir. 2004)("Rate-making, of course, is the paradigmatic example of the conduct that Congress intended to protect by the McCarran-Ferguson Act."). The rate-making process directly impacts the policy relationship between the insurer and the insured, and the challenged practice here only involves entities within the insurance industry. Thus, the second and third Pireno factors are satisfied, and the challenged conduct constitutes the "business of insurance" under the McCarran-Ferguson Act.[6]

 2. Regulated by Delaware Law

Delaware's Insurance Code is codified at 18 Del. C. §

---

[6]Other courts have recognized that title insurance constitutes the business of insurance for purposes of the McCarran-Ferguson Act. See, e.g., In re New Jersey Title Ins. Litig., No. 08-1425, 2010 WL 2710570 at *8-*9 (D.N.J. Jul. 6, 2010); In re Title Insurance Antitrust Cases, No. 08-677, 2010 WL 1267129 at *27 (N.D. Ohio Mar. 31, 2010); Crawford v. Am. Title Ins. Co., 518 F.2d 217, 217 n.1 (5th Cir. 1975); Commander Leasing Co. v. Transamerica Title Ins. Co., 477 F.2d 77, 83 (10th Cir. 1973).

101 et seq., and plaintiffs concede that "title insurance is covered by a number of the provisions in the Code." Pl. Resp. at 14. In Delaware, the DOI regulates title insurance. 18 Del. C. § 2502 (West 2009). Delaware law permits insurers to comply with the rate filing requirements through membership in a licensed rating bureau such as the DTIRB. 18 Del. C. §§ 2510-12. We have already determined that Delaware law provides effective review of the title insurance industry. McCray v. Fidelity National Title Insurance Co., 636 F.Supp.2d 322, 330 (Del. 2009)("Delaware's regulatory regime. . . amounts to meaningful and competent review of [title insurance] rate filings to determine whether rates comply with the statutory principles"). It is merely worth noting that "the McCarran Act exemption does not depend on the zeal and efficiency displayed by a state in enforcing its laws. Congress has provided that exemption whenever there exists a state statute or regulation capable of being enforced." In re New Jersey Title Ins. Litig., 2010 WL 2710570 at *11 (quoting Lawyers Title Co. of Mo. v. St. Paul Title Ins. Corp., 526 F.2d 795, 797 (8th Cir. 1975))(internal quotation marks omitted). "Once the existence of such regulatory authority has been ascertained, federal enforcement must yield to the state." Id. (internal quotation marks omitted). Delaware law explicitly regulates defendants' collective rate-setting practices.

We find that defendants' collective rate-setting practices are the "business of insurance," that Delaware law governs these practices, and that plaintiffs have not alleged a

```
```

boycott.  Thus, the McCarran-Ferguson Act's exemption provision bars plaintiffs' Sherman Act claim.  As defendants note in their motion, the relief plaintiffs seek would require us to make a forbidden foray into the province of Delaware's insurance regulators and invalidate Delaware's regulatory scheme for setting title insurance rates -- something the McCarran-Ferguson Act prohibits.

In view of our holding that McCarron-Ferguson bars plaintiffs' Sherman Act claim, we need not address defendants' state action doctrine or <u>Burford</u> abstention arguments.  We will grant defendants' motion to dismiss the amended complaint and finally put this protracted matter to rest.

                                        BY THE COURT:

                                        __\s\Stewart Dalzell